UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOBILT, INC.,

    Plaintiff,

v.

BYSTRONIC, INC.; and ON POINT
SOLUTIONS, INC.,

    Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW Plaintiff, Motobilt, Inc., and alleges against Defendants Bystronic, Inc. and On Point Solutions, Inc., as follows:

## PARTIES

1. Plaintiff Motobilt, Inc. ("Motobilt") is an Alabama corporation located in Ozark, Alabama dedicated to producing quality American-made aftermarket and custom-made parts for Jeep and other off-road vehicles as well as job shop manufacturing for other manufacturers.

2. Defendant Bystronic Inc. ("Bystronic") describes itself as being a "leading global provider of high-quality solutions for the sheet metal processing business." Its business focuses on the automation of the complete material and data flow of the cutting and bending process chain. Bystronic claims that its automation solutions "optimize the material flow, improve machine utilization, and increase both work safety and process reliability." Bystronic is a New York corporation with its principal place of business in Hoffman Estates, Illinois. Bystronic may be served via its registered agent, David D. O'Sullivan, at 1755 S. Naperville Road, Suite 200, Wheaton, Illinois, 60189.

3. Defendant On Point Solutions, Inc. ("On Point") is the exclusive sales

representative for Bystronic metal cutting lasers in Wisconsin, Michigan's Upper Peninsula, Kentucky, Tennessee, Alabama, Arkansas and Mississippi. On Point states that it offers small and large format fiber laser equipment from Bystronic, as well as knowledgeable service and support for Bystronic machines. On Point is a Tennessee corporation with its principal place of business in Murfreesboro, Tennessee. On Point may be served via its registered agent, Christie S. Shedd, at 131 Heritage Park Drive, Suite 102, Murfreesboro, Tennessee, 37129.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000.00 and is between citizens of different states.

5. Venue is proper in this District under 28 U.S.C. § 1391(c) because Bystronic has its principal place of business in this District. Venue in this District is also proper under 28 U.S.C. § 1391(b)(2) because the contract between the Parties states that any "action or proceeding arising out of or relating to the Agreement shall be instituted in an Illinois State or Federal Court located in the County of Kane and State of Illinois and that such is the convenient and appropriate forum."

## FACTUAL ALLEGATIONS

**A.   Motobilt's business and background**

6. Motobilt is a small company located in Ozark, Alabama, dedicated to producing quality aftermarket and custom-made parts for Jeeps and other off-road vehicles and to job shop manufacturing for other manufacturers.

7. Motobilt designs and manufactures these aftermarket and custom-made parts "in-house" using a variety of techniques, starting with designing them using 3D CAD software, to manufacturing them using laser cutters, press brakes and welders, to finishing the products and packaging them to their customers' expectations.

8. Motobilt's products are highly sought after by Jeep enthusiasts and passionate

drivers of other off-road vehicles from all over the country.

9. In the early part of 2018, Motobilt's production capabilities could not keep pace with the demand for its products, and it began exploring options to upgrade its facilities and to transition to equipment that had integrated automation features that would allow its manufacturing processes to continue overnight without Motobilt's full staff on site.

**B.     On Point enters the picture.**

10. In May 2018, Motobilt contacted On Point to discuss purchasing a piece of equipment called a slag hog which it would use to clean the Amada laser Motobilt was using at that time to cut out its metal parts.

11. During the meetings to discuss purchasing the slag hog, On Point explored Motobilt's need for an automated system to keep up with the demand for its goods and pivoted the discussions toward Bystronic's products. On Point invited Chad Jackson, a representative from Bystronic to attend these meetings.

12. On Point and Bystronic explained how Bystronic was the leader in both laser cutting technology and automation. They brought samples of precisely cut parts that were cut using a Bystronic laser to demonstrate the quality of Bystronic's lasers. Knowing Motobilt's need for an automated process, On Point and Bystronic extolled the quality and reliability of Bystronic's products.

13. On or about December 28, 2018, Motobilt was invited to tour Bystronic's facilities in Italy and Switzerland where they were shown Bystronic's automation systems working flawlessly. Motobilt was told that each of the systems was custom built per each customer's order and that they were pre-assembled and thoroughly tested prior to shipping. Motobilt was led to believe that all parts of the Bystronic System were manufactured in Italy and Switzerland.

3

14. Motobilt's representatives were taken to the facilities of several Bystronic customers, where they were shown Bystronic systems which were operating flawlessly.

15. While in Europe, Brody Fanning, a Vice President of Sales for Bystronic, met with Motobilt as well as current Bystronic customers and other potential customers. During these meetings, Motobilt's representatives were told that Bystronic monitors its lasers remotely and that it can predict maintenance needs so that it can automatically send out parts and schedule tech support. This was important to Motobilt because it seemed to demonstrate Bystronic's commitment to maintaining the maximum amount of uptime for its manufacturing process.

16. Motobilt was further informed that Bystronic had very few service issues and that any service issues which arose would be addressed by an onsite technician within forty-eight (48) hours of reporting a problem.

17. Motobilt was shown how the Bystronic Systems were manufactured and tested, and Bystronic extolled the "Swiss precision" which they claimed they put into their products. Motobilt relied upon Bystronic's promise of "Swiss precision" when it decided to purchase the Bystronic System.

18. On its website, Bystronic makes eight "promises" to its customers. Included among these eight promises are promises that:

> (1) Bystronic will support its customers and will "never abandon" them, offering them first-class consulting and support for all questions related to their products;
>
> (2) Bystronic's products are manufactured with "Swiss quality" and will deliver "first-class quality" wherever their products are sold;
>
> (3) Bystronic's products offer its customers "affordable innovation" "of the highest quality at fair market prices" which will "provid[e] our customers with clear, competitive advantages";

(4) Bystronic's products are "user-friendly and powerful" and offer its customers "high productivity . . . at low operating costs"; and

(5) Bystronic will be a "trusted partner" to its customers.

**C.     The June 19, 2019 Sales Orders**

19.     On June 19, 2019, Motobilt entered into a series of sales orders to purchase several of Bystronic's products: (1) ByStar Fiber 3015 Dynamic Edition F1000, (2) ByTower and ByTrans Extended, (3) Xpert 80/1350 and Xpert 150/3100 Press Brakes, and (4) the computer software that makes all of the equipment work together (collectively, the "Bystronic System").

20.     In order to finance the Bystronic System, Motobilt sold its existing laser cutting and steel bending system in order to offset the $1,725,000.00 price tag for the Bystronic System.

**1.     ByStar Fiber 3015 Dynamic Edition F10000**

21.     The first—and most expensive—component of the Sales Order is a ByStar Fiber 3015 Dynamic Edition F10000 (the "ByStar"). The ByStar is a laser cutting system used to cut through sheets of metal, including aluminum and steel.

22.     In the Sales Order (Exhibit A attached hereto), the ByStar is touted by Bystronic and On Point as being as simple to operate as a smartphone. Bystronic and On Point further championed the automation features and reliability of the ByStar in the Sales Order, stating that "[a] wide range of automation solutions guarantees maximum machine utilization and process reliability even during unmanned operation."

23.     Motobilt paid $1,000,000 for the ByStar.

**2.     ByTower and ByTrans Extended**

24.     The next components included in the Sales Order (Exhibit B attached hereto) are what Bystronic calls its "ByTower" and "ByTrans Extended" products. The ByTower is advertised as being a storage tower for the rest of the Bystronic system which is "automatically

5

loaded and unloaded" making "the entire system significantly better utilized." This increase in system utilization (or efficiency) is realized because "[f]requently used materials are immediately available because they are stored directly next to the machine" and because the "return transfer of cut sheets is automatic by the system."

25. The ByTrans Extended is the system that automatically transports raw material from the ByTower to the ByStar (as example) for cutting and will take finished pieces back to the ByTower for storage.



ByTower



ByTrans Extended

26. The ByTower and ByTrans Extended products were designed and advertised to Motobilt as being products that would work together to automatically load product into the ByStar for cutting, then return finished products and waste products to their appropriate bins (or "cassettes") on the ByTower.

27. As with the ByStar, Bystronic and On Point touted the automation features of the ByTower and noted that the ByTower is as simple to operate as a smartphone. Bystronic and On Point further championed the automation features and reliability of the ByTower in the Sales Order, stating that "[a] wide range of automation solutions guarantees maximum machine utilization and process reliability even during unmanned operation."

28. Motobilt paid $305,000 for the ByTower and the ByTrans Extended products.

### 3. Xpert 80/1350 and Xpert 150/3100 Press Brakes

29. The final components of the Bystronic System are the Xpert 80/1530 and Xpert 150/3100 Press Brakes (the "Xpert Press Brakes"), and the computer software that operates the System (Exhibits C and D attached hereto).

30. The Xpert Press Brakes are used to bend cut steel into their final or near-final shapes, and the computer software makes the equipment in the Bystronic System work together.

31. Motobilt paid a total of $420,000.000 for the Xpert Press Brakes.

**D. Terms common to each of the orders.**

32. As noted above, the Sales Order is comprised of multiple orders for the various components of the Bystronic System purchased by Motobilt. However, each of the individual orders have nearly identical terms and conditions, including the following.

33. The scope of the agreement between the parties is broadly defined within the Sales Orders as including:

    a. Any Bystronic proposal, bid or similar document setting forth the prices of any Goods, and

    b. The Sales Order and Confirmation of Sales Order and any other documents or forms provided by Bystronic relating to the Goods, and

    c. Any documenting evidencing or relating to the purchase of the

Goods.

34. Under the Sales Orders, the term "Acceptance" means that "the equipment is running according to Bystronic's specifications at [Motobilt's] site."

35. Further, Motobilt's acceptance of the terms and conditions, including the express limitations contained therein as discussed further below, is conditioned upon "receipt and acceptance by [Motobilt] of the Goods."

36. The Sales Orders contain a twelve-month warranty for both parts and labor for the Bystronic System:

> Warranty. If not otherwise agreed upon by BYSTRONIC, all component parts of the Goods manufactured by BYSTRONIC shall be warranted against material defects in materials and workmanship for a period of twelve (12) months from Delivery. . . . Any such component parts proved to be defective due to faulty material or workmanship will be replaced free of charge at Buyer's Site.

37. However, Bystronic specifically sought to limit its liability under the Sales Orders to the warranty terms outlined above:

> BYSTRONIC AND ITS RELATED AND/OR AFFILIATED COMPANIES, MAKE NO WARRANTIES OR REPRESENTATIONS WHICH EXTEND BEYOND THOSE EXPRESSLY SET FORTH HEREIN AND DISCLAIM ALL LIABILITY FOR ANY LOSS OR DAMAGE, DIRECTLY OR INDIRECTLY, ARISING FROM THE USE OF SUCH GOODS OR FOR CONSEQUENTIAL DAMAGES.

**E. Delivery and installation of the Bystronic System.**

38. On September 30, 2019, the ByTower and ByTrans were delivered to Motobilt.

39. Problems with the Bystronic System began almost immediately, when Bystronic's installation technician noticed that the counterweight for the ByTower had been manufactured "out of spec," which prevented it from operating correctly. Bystronic's installation technician requested that Motobilt take the ByTower counterweight to a truck stop to weigh it on a truck

scale, where the manufacturing error was confirmed, and a new counterweight was ordered.

40. The installation issues continued when the cassettes did not fit the ByTower. Without usable cassettes, Motobilt was unable to utilize the important automation aspect of the Bystronic System. Bystronic's remedy for this was to send cassettes from a demo unit they had used at the FABTECH trade show.[1] Not only were these cassettes not a complete set, but also, they did not fit Motobilt's ByTower.

41. At this point, Robert St. Aubin, president of Bystronic's Market Division in North and South America, became personally involved and promised Motobilt that they would be fully operational by early December. Through these conversations with Mr. St. Aubin, Motobilt learned that the cassettes were manufactured in the United States, not in Europe, where Bystronic told Motobilt the Bystronic System was manufactured prior to Motobilt's purchasing of the Bystronic System.

42. Bystronic had a third set of cassettes manufactured and shipped to Motobilt, and, *again*, these cassettes did not fit; they were manufactured too thick to fit Motobilt's ByTower. Bystronic's solution to this problem was to use hand grinders to remove material from the ByTower/ByTrans to allow them to fit into the ByTower. This process was "completed" on December 17, 2019, more than *eleven weeks* after the ByTower was installed. Still today, one of the cassettes is unusable because it is out of specification.

43. Unfortunately, Motobilt's problems with the Bystronic System were only beginning.

---

[1] FABTECH bills itself as "North America's largest metal forming, fabricating, welding and finishing event." *See* https://www.fabtechexpo.com/about (last accessed January 15, 2021).

**F.     The Bystronic System has been a never-ending string of problems for Motobilt.**

44.     Starting with the issues noted above during its installation, the Bystronic System has been little more than a string of problems for Motobilt. These issues include, but are not limited to, the following:

45.     **December 5, 2019**. Material aligned against the preinstalled alignment pins on the cassettes would place the sheets outside of the cutting area. After informing Bystronic of the problem, Motobilt was told by Bystronic not to align material against the alignment pins and to "place a tube" over the alignment pins to correctly place the sheets. Bystronic has been unable to resolve this problem, and the only suggestion made by Bystronic was for Motobilt to machine tubes to slide over it.

46.     **December 18, 2019.** The twin fork system has had issues clearing the vertical fingers on the parts cassettes and has created visual damage to the unit.

47.     **January 27, 2020.** Issues with the "shuttle tables" are presenting errors at random times. Still having issues with the alignment pins on the cassettes. Not able to run in automation and having to run jobs manually.

48.     **February 4, 2020.** Bystronic advises that they placed their cutting metal in a specific position to prevent error messages, but, as Bystronic's techs were aware, whenever metal is placed in that position, they get yet another error. Still having issues with the ByTrans and error messages despite multiple attempts by Bystronic technicians to fix the issue. Still having software issues.

49.     **February 5, 2020.** Still having errors when trying to load cassettes into the machine. Not able to run quarter inch steel automated like Motobilt needs.

50.     **February 12, 2020.** Unable to move anything in the ByTower or ByTrans without

10

the automation looking for a parts cassette or waiting on the twin fork system to allow clearance. Unable to access material currently in the tower. Unable to move a material cassette to the top position to load the laser.

51. **February 19, 2020.** Motobilt experienced seemingly random errors with shuttle tables not switching due to a release error. This caused the entire automation process to stop production. To correct this, Motobilt had to take the job out of automation mode, manually park the shuttle tables, manually park the ByTrans, and then manually switch the parts.

52. **February 25, 2020.** Bystronic technicians arrived at Motobilt to address software issues. After the software was reinstalled, the ByTrans refused to move, even when manually directed to. The Bystronic technicians removed the shielding from the shuttle table and noticed that a drive chain was out of relation to the table, which caused the chain to not grab the table so that it could move it. The Bystronic technicians further diagnosed a faulty encoder on the motor. They also identified a faulty sensor on the ByTrans that was supposed to detect parts cassettes. The sensor was likely sheared off during production by a cassette or a part.

53. **February 27, 2020.** Bystronic technicians discovered a manufacturing defect in some of the cassettes where a "stop block" was manufactured backward. Bystronic ships new stop blocks and they are installed on February 28, 2020.

54. **March 3, 2020.** Bystronic technician noticed that the middle loading point on the ByTrans is not parallel, which caused an issue moving cassettes in and out of the middle spot in the ByTrans.

55. **June 12, 2020.** On June 9, 2020, the outside table refused to return to its resting position. Motobilt called Bystronic, and a technician walked it through several tests to try and source the problem, to no avail. The next day, the problem was finally narrowed down to possibly

11

being a bad solenoid valve. A new part was ordered and, on June 12, 2020, a Bystronic technician arrived to install the part.

56. **August 24, 2020.** Issues with sensors on the ByTrans not reading the cassette. Bystronic mails a replacement sensor and provides Motobilt with plans for brackets and asks Motobilt to manufacture them themselves.

57. **August 31, 2020.** Automation stops again because ByTrans cannot detect a sheet in the unload position.

58. **September 5, 2020.** Motobilt informed Bystronic of issues with its production, primarily issues with a broken chain affecting the RBG and the ByTower.

59. **September 8, 2020.** Motobilt contacts a Bystronic service manager (Eli Lane) regarding this issue and is directed to contact the "hotline" directly. Motobilt does so and is connected with a tech who has "never worked on a ByTower" and who has "not seen a ByTower in like 2 ½ years."

60. **September 15, 2020.** RBG and ByTower still not operational. Eli at Bystronic admitted that he had forgotten to schedule a technician.

61. **September 25, 2020.** ByTower down for three weeks now. Repairman (Josh) left without a clear picture as to what the plan of action is to correct the tower issues. Informed that it would take 2-3 weeks to have a brake manufactured or for one to come from Switzerland. Error with laser showing laser power difference is too big.

62. **September 30, 2020.** ByTower has been down for about four weeks. The laser will not communicate with either the ByTrans or the Shuttle table. Production is down completely. A tech arrived and performed what he considered to be a repair. However, as soon as the machine needed to change material, errors came back which the tech was unable to clear.

63. **October 2, 2020.** Cannot run the laser at all because the laser will not communicate with the automation (ByTrans/ByTower).

64. **October 6, 2020.** The tower has been down for approximately one month. A replacement motor arrived, but the tech onsite stated that he was slated to leave that day and that someone would be there in a week to start the install and repair. Expressed concerns that there is no clear timeline to be operational.

65. **October 8, 2020.** Motobilt informed Bystronic that they received errors for the laser being out of tolerance, as well as that the twin forks are lowered unevenly, and the corresponding errors will not allow manual operation of the twin form.

66. **October 29, 2020.** Josh (Bystronic service tech) addressing issues with the ByTower and ByTrans automation. Part of the issue is the design of the RBG. The sensors that extend out on the chains to pull cassettes into place are exposed. The place where the service techs have the plate being unloaded onto the parts cassettes stacks up and when removed from the ByTrans back into the tower, the cut plate rips the sensor off which shuts down the machine. This cannot be corrected or eliminated unless Bystronic does a redesign on the machine process.

67. **November 12, 2020.** When in automatic mode, the ByTrans and ByTower have constant random errors at random times. Rarely will the tower ever remove material and/or parts cassettes in automatic mode and place a new one in the ByTrans without an error. Motobilt has repeatedly told Bystronic of the errors. Additionally, the service techs have seen the errors, and Motobilt has notified the hotline that the laser is giving an error which indicates that the laser source has an issue making more power than it should. This has not been resolved.

68. **November 13, 2020.** When trying to move from the bottom load position to the top position in the ByTrans, the system errors out with this recurring message and does not update

13

where the cassette is placed.

69. **December 2, 2020.** Motobilt contacted Bystronic to report that the ByTower was breaking the toe ball off of a drag chain. After repeated communications, Bystronic ships a new section of chain for Motobilt to install itself.

70. **December 7, 2020.** After Motobilt installed the new section of chain, the ByTower was still inoperable. Motobilt requested that Bystronic send an on-site technician.

71. **December 15, 2020.** Bystronic's technician arrives and finds that chain adjusters were bent, which prevented the chains from having the proper tension. The technician informed Motobilt that the parts were not in stock and would take at least a week to get the correct parts from Switzerland.

72. **January 19, 2021.** Russ Blessin, a Bystronic service representative, arrived at the Motobilt location to address issues with the RBG chains continuing to fail. He noted there were issues with the RBG not being square as well as other issues: 1) One of the material cassettes was manufactured out of specification; he pulled it from service; 2) A sensor block was missing on one of the parts cassettes; he stated that this would cause errors when running in automatic mode. He said that Motobilt could continue to use it but that it could cause a problem. He also found something wrong with the ByTrans; he ordered parts for the ByTrans, and they have been sitting at Motobilt for many weeks. Eli, the service manager for Bystronic, was to contact Motobilt to schedule a date to install the parts per Russ. Since Russ left Motobilt in January, Motobilt has not been running the ByTrans or the ByTower in automatic mode for fear that the machinery will break down without the parts that need to be installed. Motobilt still has not heard from Eli on when someone will be there to repair the issues.

73. The machinery is still not running correctly, and Motobilt has not heard back from Bystronic as to when it will address the remaining problems.

## COUNT I

### BREACH OF WARRANTY
### (as to Defendant Bystronic, Inc.)

74. Motobilt paid $1,725,000.00 for the Bystronic System.

75. Bystronic expressly stated in the Sales Order that the Bystronic System's "wide range of automation solutions **guarantees** maximum machine utilization and process reliability even during unmanned operations."

76. To date, the Bystronic System has worked properly for fewer than thirty (30) days out of the more than four hundred (400) days since it was installed on Motobilt's premises. This clearly does not comport with the "maximum machine utilization and process reliability" guaranteed by Bystronic.

77. The Bystronic System was expressly warranted by Bystronic as being free from "material defects in materials and workmanship," and provided that "[a]ny such component parts proved to be defective due to faulty material or workmanship will be replaced free of charge at [Motobilt's] site."

78. Bystronic has attempted to repair the Bystronic System numerous times since its installation, but Bystronic has been unable to provide Motobilt a Bystronic System free from material defects in materials and workmanship as promised by Bystronic.

79. The Bystronic System has never operated as expected by Motobilt and as guaranteed by Bystronic. Motobilt's constant request for repairs from Bystronic has resulted in numerous trips to Motobilt's premises by Bystronic technicians to attempt a repair of the Bystronic System. Despite Bystronic's efforts to repair the Bystronic System, it still does not function as

promised by Bystronic.

80. Bystronic tried to specifically limit its liability to its warranty obligations in the Sales Order:

> BYSTRONIC AND ITS RELATED AND/OR AFFILIATED COMPANIES, MAKE NO WARRANTIES OR REPRESENTATIONS WHICH EXTEND BEYOND THOSE EXPRESSLY SET FORTH HEREIN AND DISCLAIM ALL LIABILITY FOR ANY LOSS OR DAMAGE, DIRECTLY OR INDIRECTLY, ARISING FROM THE USE OF SUCH GOODS OR FOR CONSEQUENTIAL DAMAGES.

81. Under the Illinois UCC, such a disclaimer will **not** operate to foreclose an aggrieved party from pursuing all remedies available to it under Illinois' law where "circumstances cause an exclusive or limited remedy to fail of its essential purpose." 810 ILCS 5/2-719. Illinois law is clear that "[a] remedy limitation fails of its essential purpose when a seller unreasonably delays the replacement of the product, refuses to replace it at all, **or is unsuccessful in correcting the defects within a reasonable time**." *Lara v. Hyundai Motor Am.*, 770 N.E.2d 721, 728-29 (Ill. App. 2002) (emphasis added). Such is the case here.

82. It has been more than four hundred days since the Bystronic System was delivered to Motobilt, and Motobilt is still experiencing both new and old issues with it that have caused and continue to cause injury to Motobilt.

83. The incessant malfunctions of the Bystronic System have cost Motobilt lost revenue from customers whose orders they were either unable to fill or whose orders they had to turn down.

84. To be clear, Motobilt is not bringing this lawsuit due to a "one off" failure of one of the many components of the Bystronic System, but rather due to the multitude of issues with numerous components of the Bystronic System as described herein, which Bystronic has been unwilling or unable to resolve. Due to Bystronic's inability to provide Motobilt with a Bystronic

16

System as represented by Bystronic and as agreed to by Motobilt, the remedy limitation contained in the Sales Order has failed of its essential purpose; therefore, Motobilt is entitled to seek consequential and incidental damages as provided for in 810 ILCS 5/2-715.

85. As a direct and proximate result of Bystronic's breach of warranty, Motobilt has suffered actual damages in the form of lost income from orders it was unable to fill and orders it was unable to take.

86. Motobilt is entitled to a refund of the entire purchase price of the Bystronic System ($1,725,000.00), its consequential and incidental damages, and any other relief this Court deems is proper.

## COUNT II

### BREACH OF CONTRACT
### (as to Defendant Bystronic, Inc.)

87. On June 19, 2019, Motobilt and Bystronic entered into a series of contracts (the June 19, 2019 Sales Orders) in which Motobilt agreed to purchase the Bystronic Systems from Bystronic.

88. Motobilt fully performed its obligations under the Sales Orders by paying Bystronic $1,725,000.00 for the Bystronic System.

89. Bystronic expressly stated in the Sales Order that the Bystronic System's "wide range of automation solutions **guarantees** maximum machine utilization and process reliability even during unmanned operations."

90. To date, the Bystronic System has worked properly for fewer than thirty (30) days out of the more than four hundred (400) days since it was installed on Motobilt's premises.

91. Bystronic has breached the Sales Order by failing to provide Motobilt with a Bystronic System which functions as described, as promised, and as agreed upon pursuant to the

Sales Orders.

92. As a direct and proximate result of Bystronic's breach, Motobilt has suffered actual damages in the form of lost income from orders it was unable to fill and orders it was unable to take.

93. Motobilt is entitled to a refund of the entire purchase price of the Bystronic System ($1,725,000.00), its consequential and incidental damages, and any other relief this Court deems is proper.

## COUNT III

### BREACH OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/1 *et seq.*
### (as to all Defendants)

94. Motobilt is a "consumer" and a "person" as defined in 815 ILCS 505/1.

95. Bystronic and On Point engaged in unfair or deceptive acts as set forth in 815 ILCS 505/2 by making misleading, false, and/or deceptive statements regarding the quality and reliability of not only their products but also of their after-sales repair service.

96. These misleading, false, and/or deceptive statements included statements that:

   a. The Bystronic System was reliable;
   b. The Bystronic System was manufactured in Switzerland and Italy with "Swiss quality" and will deliver "first-class quality";
   c. The Bystronic System would be thoroughly tested prior to being shipped to Motobilt;
   d. The Bystronic System would have very few service issues, but any service issues which arose would be addressed by an onsite technician within forty-eight (48) hours of a problem being reported;
   e. Bystronic would support Motobilt and never abandon it;
   f. The Bystronic System would offer Motobilt high productivity at low operating costs.

97. Each of these misleading, false, and/or deceptive statements was made in the course of conduct involving trade or commerce, specifically in the course of Bystronic and On Point

marketing and selling the $1,725,000.00 Bystronic System to Motobilt.

98. Bystronic and On Point knew that these statements were misleading, false, or deceptive when they made them to Motobilt.

99. Bystronic and On Point intended that Motobilt would rely upon their misleading, false, or deceptive statements when making its decision to purchase the Bystronic System. In fact, Motobilt did rely upon these misleading, false, or deceptive statements when it decided to and purchased the Bystronic System.

100. After purchasing the Bystronic System, Motobilt has suffered actual damages and ascertainable loss stemming from the Bystronic System's repeated failures which have caused Motobilt to lose income from orders it was unable to fill and orders it was unable to take.

101. Motobilt's damages were proximately caused by Bystronic and On Point's misleading, false, and/or deceptive statements.

102. Motobilt is entitled to actual damages, punitive damages, and reasonable attorneys' fees and costs, as well as any other relief the Court deems proper.

Dated: April 14, 2021

/s/Mark R. Miller
Mark R. Miller
Wexler Wallace LLP
55 W. Monroe Street, Ste. 3300
Chicago, IL 60603
Tel: 312-346-2222
Fax: 312-346-0022
mrm@wexlerwallace.com

W. Lee Gresham, III
Heninger Garrison Davis, LLC
2224 1st Avenue N.
Birmingham, AL 35203
Tel: 205-326-3336
Fax: 205-326-3332
lee@hgdlawfirm.com