IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Motobilt, Inc.                          )
                                        )
        Plaintiff,                      )
                                        )
                                        )
        v.                              )   No. 21 C 1996
                                        )
Bystronic, Inc.,                        )
                                        )
        Defendant.                      )


Memorandum Opinion and Order

    Plaintiff Motobilt is a manufacturer of custom automotive
parts. It filed this breach of warranty action to recover losses
it claims to have sustained when equipment it purchased from
defendant Bystronic failed to function as warranted.[1] Specifically,
plaintiff claims that it purchased four items of equipment designed
to work together to automate the process of metal sheet-cutting,
but that two of the four components—the very parts that provided
automation—were beset with problems from the start. Plaintiff
alleges that defendant was unable or unwilling to remedy these
problems for more than a year and a half, during which time the
equipment failed to function reliably as an automated system.
Accordingly, plaintiff claims that defendant failed to satisfy its

---

[1] Plaintiff's complaint also asserts a claim for breach of
contract, but plaintiff has since acknowledged that dismissal of
that claim is appropriate.

obligations under the limited warranty contained in each of the sales orders setting forth the terms of the sales agreement. That provision states:

> Warranty: If not otherwise agreed upon by BYSTRONIC, all component parts of the Goods manufactured by BYSTRONIC shall be warranted against material defects in materials and workmanship for a period of twelve (12) months from Delivery. . . . Any such component parts proved to be defective due to faulty material or workmanship will be replaced free of charge at Buyer's Site.

Am. Compl., ECF 18 at ¶ 36.

Several motions are currently pending: defendant's motion for summary judgment; motions by each party to exclude the other's expert testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); and defendant's motion to strike the affidavit of plaintiff's CEO, Dan DuBose. For the reasons that follow, each of defendant's motions is granted, and plaintiff's *Daubert* motion is denied as moot.

I.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this juncture, I do not "weigh the evidence and determine the truth of the matter" but rather decide if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). I must credit all of plaintiff's admissible

evidence, *id.* at 255, but my "favor toward [plaintiff] does not relieve it of the obligation to 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1007 (7th Cir. 1996) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Under Illinois law, claims for breach of limited warranty are governed by the Illinois Uniform Commercial Code ("UCC"). *Evitts v. DaimlerChrysler Motors Corp.*, 834 N.E.2d 942, 949 (Ill. App. Ct. 2005). "A plaintiff may seek damages pursuant to section 2-719(2) of the UCC where a warranty provides an exclusive or limited remedy and the warrantor fails to provide such a remedy in a reasonable manner." *Id.* Accordingly, Illinois law "require[s] a manufacturer to make successful repairs within a reasonable time or a reasonable number of attempts." *Pearson v. DaimlerChrysler Corp.*, 813 N.E.2d 230, 238 (Ill. App. Ct. 2004).

Whether the manufacturer's remedy was reasonable is generally a factual determination. *Van Zeeland v. Rand McNally*, 532 F. Supp. 3d 557, 565 (N.D. Ill. 2021). But defendant urges me to conclude on the record here that the remedy it provided satisfied its warranty obligations as a matter of law. Having reviewed the evidence of plaintiff's complaints and defendant's responses, I decline to do so, as I conclude that a jury could reasonably find that defendant failed to repair the problems plaintiff reported in

a reasonable time and manner. Nevertheless, defendant is entitled to summary judgment because even assuming that defendant were found to have breached the limited warranty, plaintiff has offered no admissible evidence to establish its damages.

## II.

"In a suit for damages for breach of a written express warranty, the burden of proof is on the plaintiff to show by a preponderance of the evidence ... damages measured by the terms of the warranty." *Hasek v. DaimlerChrysler Corp.*, 745 N.E.2d 627, 638 (Ill. App. Ct. 2001). Plaintiff's complaint alleges that it suffered "actual damages in the form of lost revenue, lost profits, lost customers and lost opportunities due to its inability to fill and (sic) orders and take on new orders." Am. Compl., at ¶ 72. But in response to defendant's discovery requests seeking documents "relating to the claim by Motobilt, Inc. that it suffered substantial actual damages," plaintiff responded that it had no responsive documents. *See* Pl.'s L.R. 56.1 Resp., ECF 82 at ¶¶ 58-62. When defendant examined plaintiff's corporate witnesses, Dan and Hunter DuBose, on the subject of plaintiff's damages, neither was able to quantify the damages plaintiff suffered or explain how such damages could be calculated. For example, Dan DuBose stated his "opinion" that plaintiff had suffered damages in the form of lost revenue, lost profits, lost customers, lost opportunities, and inability to fill orders but acknowledged that plaintiff did

not keep track of such losses. *See* Dan DuBose Dep., ECF 71-15 at pages 251, 253-54. Dan DuBose testified that he believed Hunter DuBose had performed calculations to quantify plaintiff's damages. *Id*. at 254. But when defendant asked Hunter DuBose whether she had "done any calculations as to what you believe the damages, money damages, were to Motobilt," she testified that she had "done a little bit of research" with respect to the damages plaintiff was claiming but had not calculated plaintiff's "complete damages." Hunter DuBose Dep., ECF 71-16 at page 78. Hunter DuBose explained that plaintiff intended to "rely on our expert to help us do those calculations," *id*. at 81, but she acknowledged that plaintiff had no records reflecting lost shop time, lost revenue, unfulfilled orders, or business it turned down, and that there was no way to "recreate" that information. *Id*. at 79-82.

In February of 2023, after the close of fact discovery, plaintiff disclosed the opinions of a damages expert, Steve Morang, who offered two damages models based on his valuation of the equipment in light of its failure to operate as warranted. In his report, Mr. Morang observes that under the Illinois Uniform Commercial Code, "[t]he measure of damages for breach of warranty is the "the ***difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted***." Morang Rep., ECF 67-1 at 3 (original emphasis). He then articulates two valuation models,

each based on "performance measures of the goods in question." Morang Rep., ECF 67-1 at 3. In the first model, Mr. Morang assumes, based on a conversation with plaintiff's corporate representatives, that the equipment was 60% less productive in "manual loading operation" (i.e., when the parts responsible for automation failed to function as warranted) than it was in "fully-automated operation" (i.e., when the equipment functioned as warranted). *Id.* at 4.[2] Based on this "observed" 60% loss of productivity, Mr. Morang opines that the value of the equipment at the time of purchase was 60% less than the price plaintiff paid for it. In his second model, Mr. Morang points to a statement published in a blog post on defendant's website that asserts, "[a]dding automation can provide, on average, 30% greater efficiency by maintaining a consistent pace of production and eliminating process variables." *Id.* at 3-4. Based on this putative 30% loss of productivity as compared to what defendant represented, Mr. Morang opines that the value of the equipment at the time of purchase was 30% less than the price plaintiff paid for it. Neither of these models survives *Daubert* scrutiny.

---

[2] At his deposition, Mr. Morang testified that his percentage estimate is based on a half-hour telephone conversation he had with Dan and Hunter DuBose and their attorneys in December of 2022 or January 2023, during which Mr. Morang asked them to compare how long it would take the equipment to cut four sheets of metal in manual versus automatic mode. *See* Morang Dep., ECF 67-2 at 59-62.

Expert testimony is admissible under Fed. R. Evid. 702 and *Daubert* if the expert is qualified and the testimony is reliable and relevant. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). Defendant argues that Mr. Morang, a Certified Fraud Examiner whose expertise is primarily in fraud prevention, risk management, and compliance, and who does not claim to have any work experience, education, or training on how to value equipment, is unqualified to offer the damages opinions he articulates in his report. In response, plaintiff insists that Mr. Morang need not "have a PhD or a background as an expert in laser cutting systems" to qualify as a damages expert, and that experts may rely on other experts when their testimony touches on areas outside their expertise. Pl.'s Resp., ECF 81, at 9–1. But as the proponent of Mr. Morang's testimony, plaintiff must show affirmatively that there is *something* in his background that qualifies him to opine about the specific subject of his testimony. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("[w]hether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."). Here, the core of Mr. Morang's damages theory is his valuation of the equipment plaintiff purchased, yet he concedes that he has no experience valuing industrial equipment, and plaintiff offers nothing to substantiate his expertise in this

area. Accordingly, plaintiff has not carried its burden of showing that Mr. Morang is qualified to offer the damages opinions he articulates.

What is more, even if he were qualified, Mr. Morang's valuation methodology—which boils down to drawing an unexamined and unexplained one-to-one correlation between a perceived impairment in the equipment's productivity, expressed as a percentage, and a corresponding percent reduction in the equipment's dollar value—lacks any of the usual indicia of reliability that courts typically consider. Mr. Morang testified, for example, that he did not rely on any treatises, manuals, textbooks, or authorities in developing his damages model for this case. Morang Dep., ECF 67-2 at 8-9. He stated that he has never used this methodology in any other case, and that he is not aware of any court that has ever accepted his damages model. Morang Dep., ECF 67-2 at 86, 87. Meanwhile, defendant insists that Mr. Morang "applies accounting and economic principles" to assess the value of the equipment, but his report does not identify any such principles or explain how they support his valuation methodology. These are not the "hallmark[s] of reliability" under *Daubert*. *Cnty. of Cook v. Bank of Am. Corp.*, 584 F. Supp. 3d 562, 578 (N.D. Ill. 2022) (methodology used by no one other than the proposed expert in the case under consideration did not satisfy Daubert's reliability inquiry).

Moreover, Mr. Morang's unprecedented approach suffers from obvious analytical flaws. Perhaps the most salient is his failure to consider the equipment's expected "service life" when assessing the extent to which its total value was impaired by its initial failure to perform as warranted. All agree that defendant ultimately was able to repair the equipment's automation issues, and that beginning no later than twenty months after the equipment was installed, and through the date of Mr. Morang's deposition, the equipment functioned as warranted. Even a layperson surely understands that the price plaintiff paid for the equipment reflects its value over its useful life. Accordingly, any diminishment in value due to the equipment's initial failure to perform as warranted must logically be amortized over the service life of the equipment. Yet, Mr. Morang admitted that he was not familiar with, nor had he researched, the service life of the equipment at issue. He did express his "understanding," based on "accounting standards" and "depreciation standards," that it would be somewhere between ten and twenty years, Morang Dep., ECF 67-2 at 87, although he later conceded that "[t]here's a difference between depreciation for accounting purposes versus service life," *Id.* at 89.

In any event, neither of Mr. Morang's damages models accounts for *any* time the equipment functioned as warranted. Under his damages theory, the equipment's value at the time of purchase was,

at most, 40% (under the "observed" model) or 70% (under the "represented" model) of its purchase price, regardless of how long it was expected to be in service or how much of that time it would function in fully-automated fashion. Suppose, for example, that the equipment had an expected service life of ten years (Mr. Morang's presumed minimum), and that it experienced no automation issues after the first two years. In this scenario, by the end of its service life, the equipment would have performed at either 40% or 70% of what Mr. Morang considers "full productivity" for 20% of its useful life and at full productivity for the remaining 80% of its useful life. Yet, Mr. Morang's valuation models discount the equipment's value as if its productivity were permanently impaired. If there is any reasoned explanation for what appears on its face to be a grossly inflated discount, given that automation issues caused putative productivity losses for a comparatively short portion of the equipment's useful life, Mr. Morang does not articulate it.

For the foregoing reasons, I conclude that Mr. Morang's damages opinions are inadmissible under Fed. R. Evid. 702 and *Daubert*. Absent his testimony, the only evidence of plaintiff's damages is the affidavit of Dan DuBose dated September 27, 2023, which plaintiff offers in support of its Local Rule 56.1 Statement

10

of Additional Facts.[3] In this affidavit, Dan DuBose summarizes the facts he communicated to Mr. Morang concerning the equipment's productivity with and without automation. He then goes on to state:

> Based upon my years of experience in the automotive parts manufacturing industry, the totality of the issues Motobilt has experienced with its Bystronic equipment, and the promised and observed impact the automation can have on Motobilt's production when functioning properly, I value the equipment comprising the Bystronic system that Motobilt purchased to be $568,000, at the time Motobilt accepted it in the Fall of 2019.
>
> Had the equipment comprising the Bystronic system been as warranted, I believe that the value of the Bystronic system would have been what we paid for it, $1,725,000.
>
> Based on the diminished value of the Bystronic equipment that we purchased due to the continued problems that we experienced with the equipment for the better part of two years, I believe that Motobilt has been damaged by Bystronic's breach of warranty in the amount of $1,157,000, which is the purchase price less the value at the time we accepted it.

DuBose Aff., ECF 80-5 at ¶¶ 30-32. Defendant offers a battery of arguments for striking this testimony but touches only peripherally on the most compelling (and dispositive) one: plaintiff disclosed Dan DuBose only as a lay witness, but the damages opinions he offers are in the nature of expert testimony.

"The Federal Rules of Evidence define the basic dividing line between expert and lay testimony." *Patterson v. Baker*, 990 F.3d 1082, 1085 (7th Cir. 2021). As discussed above, opinion testimony

---

[3] Plaintiff appears to have abandoned any claim for damages for lost profits, lost revenue, lost business opportunities, and the like given its conceded lack of evidence to support such losses.

by experts is governed by Fed. R. Evid. 702 and subject to the analytical framework of *Daubert*. Lay opinions, by contrast, are governed by Fed. R. Evid. 701, and is limited to testimony that is "rationally based on the witness's perception" and "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. The latter requirement "is intended 'to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.'" *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 862 (7th Cir. 2009) (quoting Fed. R. Evid. 701 advisory comm. nn.). Yet that is precisely what plaintiff tries to do here.

The valuation of industrial equipment is not a matter of sensory perception but of specialized expertise. Indeed, Dan DuBose explicitly bases his valuation on his "years of experience in the automotive parts manufacturing industry," and, as plaintiff observes, his damages opinion "is not discernibly different from the expert opinion that Mr. Morang offered in his expert report and that he testified to in his deposition." Pl.'s Opp., ECF 90 at 5. Accordingly, his valuation of the equipment at issue—and, by extension, his assessment of plaintiff's damages—is properly characterized as expert testimony that plaintiff was required to disclose under Fed. R. Civ. P. 26(a)(2). *See Patterson* 990 F.3d at 1085 ("lay witnesses must tether any inferences to their own perception and the reasoning process of an average person in

everyday life, not to any specialized training or experience") (quotation, internal citations, and alterations omitted). While the opinions of non-retained experts are not subject to the extensive disclosure requirements of Rule 26(a)(2)(B), the party seeking to introduce such opinions must nevertheless disclose "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." *Guarantee Tr. Life Ins. Co. v. Am. Med. & Life Ins. Co.*, 291 F.R.D. 234, 236 (N.D. Ill. 2013) (quoting Fed. R. Civ. P. 26(a)(2)(C)). Plaintiff does not claim to have satisfied this requirement.

Nor was plaintiff's failure to disclose Dan DuBose's damages testimony harmless since it deprived defendant of the opportunity to examine the basis for his opinions and to test their reliability. Such an inquiry would have been all the more critical to establishing the admissibility of these opinions, given that nothing in the record suggests that Dan Dubose is qualified to offer an expert opinion about the value of the equipment plaintiff purchased, nor does he appear to have applied any methodology other than to echo the conclusions of Mr. Morang, whose opinions are themselves inadmissible for the reasons discussed above. Accordingly, Dan DuBose's damages testimony must be stricken pursuant to Fed. R. Civ. P. 37(c)(1).

13

III.

For the foregoing reasons, each of defendant's pending motions is granted. Plaintiff's motion to exclude the opinions of defendant's expert is denied as moot.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: January 5, 2024

14